**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

PHOENIX ENTERTAINMENT PARTNERS,
LLC, a North Carolina LLC,

     Plaintiff,

v.

YELLOWSTONE INDUSTRIES, INC.,

     Defendant.

Case No.:

## COMPLAINT

The Plaintiff, Phoenix Entertainment Partners, LLC ("PEP"), by its undersigned counsel, hereby complains of Defendant YELLOWSTONE INDUSTRIES, INC. ("Defendant"), and for its Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

1.   This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125.  This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.   This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act

unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because the Defendant transacts business in this District.

4.   This Court has personal jurisdiction over Defendant, in that Defendant conducts significant business in this State and federal judicial district, and the acts and events giving rise to this lawsuit of which the Defendant stands accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

5.   Plaintiff PEP is a North Carolina LLC having its principal place of business in Pineville, North Carolina.

## THE DEFENDANT

6.   Defendant YELLOWSTONE INDUSTRIES, INC. is a Georgia corporation that operates a bar and restaurant called "Metro Cafe Diner" in Atlanta, Georgia.  Defendant operates a commercial establishment that provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.

2

## BACKGROUND FACTS

7.   Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

8.   The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

9.   Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

10.  Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

11.  The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

12.  PEP is the owner of SOUND CHOICE, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

13.  PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand.

14.  Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

15.  SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

16.  The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

17.  SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

18.  Slep-Tone and its successor PEP have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

19.  Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

20.  In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

21.  In a typical bar or restaurant environment, because the imitation tracks still bear the SOUND CHOICE trademarks, when the tracks are used, the SOUND CHOICE trademarks are broadcast or published to the general public or specific market

---

[1]  In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

segment to advertise the establishment's goods, products or services for the purpose of attracting customers or supporters.

22. In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from an original, provided that the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.

23. The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

24. Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

25. Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

26. Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

27.   In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2007, Slep-Tone instituted a policy—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

28.   That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

29.   That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

30.   For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

31.   The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

32.   The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

33.   Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of

media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

34.  This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

35.  Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

36.  None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

37.  Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

## THE RIGHTS OF THE PLAINTIFF

38.  PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

39.  PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

40.  PEP is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

41.   PEP is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

42.  PEP and its predecessor have, for the entire time its
marks identified above ("the Sound Choice Marks") have been
federally registered, provided the public, including the
Defendant, with notice of those federal registrations through
the consistent display of the symbol ® with its marks as used.

43.  Principally, the Sound Choice Marks are indicators of
PEP as the origin of karaoke accompaniment tracks, meaning that
those marks indicate that the tracks to which they are applied
were made and distributed by PEP or at its direction and under
its control.

44.  PEP is the owner of distinctive and protectable trade
dress associated with its graphical displays ("the Trade
Dress").  This distinctive and protectable trade dress includes,
at a minimum, (1) the use of a particular typeface, style, and
visual arrangement in displaying the lyrics; (2) the Sound
Choice Marks; and (3) the use of particular styles in displaying
entry cues for singers, namely a series of vanishing rectangles
to indicate the cue.

45.  PEP and its predecessor have used its trade dress
continuously and substantially exclusively for a period of
decades.

46.  The individual and collected elements of the Trade
Dress have acquired secondary meaning as an indicator of PEP and

its predecessor as a source, effectively functioning as a visual trademark.

47.  The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by this Defendant are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

48.  The elements of the Trade Dress represent specific design choices by the Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

49.  No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of PEP's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF THE DEFENDANT

50.  Defendant provides karaoke entertainment at its venue Metro Café Diner in Atlanta, Georgia.

51.  On information and belief, Defendant provides karaoke shows seven days a week at the aforesaid venue.

52.  On information and belief, Defendant has utilized several individuals to facilitate the karaoke shows.

53.  On information and belief, in order to provide services, rather than using original karaoke discs that it possesses (if it indeed possesses such discs), Defendant relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

54.  On information and belief, Defendant relies upon at least one such computer hard drive described in paragraph 53 herein.

55.  On information and belief, Defendant created, or directed another to create, or otherwise acquired from a third party the files that are stored on its computer hard drive(s).

56.  Defendant did not pay any royalties or fees to PEP for the privilege of displaying the Sound Choice Marks during the karaoke shows.

57.  On information and belief, Defendant does not maintain a 1:1 correspondence relationship between its hard drives and original discs it has lawfully acquired, if it indeed has any original discs.

58.  PEP did not authorize, cause, control, or know about the creation of the files stored on the Defendant's computer hard drives at the time those files were so stored.

59.   Rather, on information and belief, the files were created by or at the behest of the Defendant, or by a third party unknown to PEP.  The party who created the files is the "origin" of the files for purposes of the Trademark Act.

60.   On information and belief, many of the files stored on the Defendant's computer hard drives are representative of karaoke tracks originally created by PEP and its predecessor and are marked with the Sound Choice Marks.

61.   When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.  As a result, when the tracks are used, the SOUND CHOICE trademarks are broadcast or published to the general public or specific market segment to advertise the Defendant's goods, products or services for the purpose of attracting customers or supporters.

62.   PEP did not authorize the Defendant to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

63.   As such, the placement of the Sound Choice Marks and the Trade Dress upon the Defendant's self-created computer files is a false designation of the origin of those computer files.

64.  At all times relevant to the causes of action stated herein, the Defendant has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

65.  Defendant's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

66.  A patron or unwitting customer of the Defendant, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of the Defendant's shows, is likely to be confused into believing, falsely, that PEP created the tracks in use or authorized their creation.

67.  Defendant has also advertised the availability of karaoke shows at its facility and, through the display of the Sound Choice Marks while the services were being provided, falsely advertised its use of genuine Sound Choice karaoke tracks.

68.  On information and belief, Defendant's activities are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time, in some cases months.

69.  Defendant's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because

they are paid to provide access to and play those computer files and tracks at karaoke shows.

70.   Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Defendant is compensated and which inures to its benefit.

71.   Defendant's piracy of accompaniment tracks is not limited to PEP's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

72.   Defendant continues to receive a financial benefit from the provision of infringing karaoke services at their establishment through the attraction of paying patrons to their establishment.

## DAMAGES

73.   Defendant's unauthorized use of PEP's trademarks has damaged PEP.

74.   Defendant damaged PEP in an amount to be proven at trial but not less than $25,000 for each karaoke system they own or operate and which contains karaoke tracks that infringe the Sound Choice Marks as detailed above, based upon their foregone purchases of original media.

75.   Defendant enjoys revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

76.   Defendant's illicit activities have also allowed it to compete unfairly against PEP's legitimate customers by lowering its cost of doing business through piracy of the music materials it uses.

77.   Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which the Defendant operate by helping to crowd higher-cost but legitimate operators out of the market.

78.   Defendant's acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

## FIRST CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT (Lanham Act)

79.   PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

80.   Defendant used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

81. Use of the Sound Choice Marks and the Trade Dress by Defendant were "in commerce" within the meaning of the Trademark Act of 1946 as amended.

82. PEP did not license Defendant to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection with the provision of their services.

83. Use of the Sound Choice Marks and the Trade Dress by Defendant in this manner is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that its services are being provided with the authorization of PEP and that its music libraries contain bona fide Sound Choice accompaniment tracks.

84. On information and belief, the acts of Defendant were willful, knowing, and intentional.

85. PEP has been damaged by these infringing activities.

86. Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

87. PEP repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

88.   On each occasion Defendant caused or permitted an unauthorized counterfeit duplicate of a PEP accompaniment track to be played during a karaoke show at a given establishment, the Sound Choice Marks and the Trade Dress were displayed in connection with the Defendant's karaoke services.

89.   The display of the Sound Choice Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved the Defendant's services and commercial activities.

90.   The display of the Sound Choice Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased or otherwise licensed by Defendant.

91.   Defendant's use of PEP's marks and trade dress in this fashion or in a more appropriate fashion would have inured to the benefit of PEP if Defendant had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

92.   Because PEP has been denied this revenue, it has been
damaged by Defendant's uses.

93.   On each occasion when Defendant caused or permitted an
accompaniment track pirated from a manufacturer other than PEP
to be played during a karaoke show, the words, names, and
symbols of the other manufacturer were displayed in connection
with the Defendant's karaoke services.

94.   Upon information and belief, Defendant's use of those
words, names, and symbols falsely designates the other
manufacturer as the origin of the pirated track, when in fact
Defendant or an upstream but unauthorized provider of the track
was the origin of that track.

95.   The display of these false designations of origin is
likely to cause confusion, or to cause mistake, or to deceive
those present during the display, in that those present are
likely to be deceived into believing, falsely, that tracks are
legitimate, authorized, and authentic materials that Defendant
acquired in a legitimate manner.

96.   The display of the false designations of origin is
also likely to cause confusion, or to cause mistake, or to
deceive those present during the display, in that those present
are likely to be deceived into believing, falsely, that the
works being performed were sold by those manufacturers and
purchased by Defendant.

97.   Defendant's use of the false designations of origin in this fashion damages PEP by enabling Defendant to provide karaoke services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers, can provide or obtain them.

98.   The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

99.   Because PEP has been denied this revenue, it has been damaged by Defendant's false designations of origin relating to other manufacturers.

Unless enjoined by the Court, the Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PEP prays for judgment against the Defendant, and that the Court:

A.   Find that Defendant committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.   Find that Defendant engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C.   Enter judgment against Defendant and in favor of PEP on all applicable counts;

D.   Find the Defendant's activities were in all respects conducted willfully and for profit;

E.   Award to PEP Defendant's profits and the damages sustained by PEP because of Defendant's conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to Two Million and no/100 Dollars ($2,000,000.00) per mark infringed and in any event in an amount not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system operated by Defendant, and not less than Fifty Thousand and no/100 Dollars ($50,000.00) for each establishment in which the infringement occurred;

F.   Award to PEP Defendant's profits and the damages sustained by PEP because of the Defendant's acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $25,000 for each karaoke system operated by Defendant, and not less than $50,000 for each establishment in which the infringement occurred;

G.   Award to PEP treble, punitive, or otherwise enhanced damages, as available, for Defendant's acts of willful infringement;

H.   Order all computer disks, drives, or other media belonging to Defendant, which media contain counterfeits of PEP's marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.   Grant PEP preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by Defendant;

J.   Grant PEP preliminary and permanent injunctive relief against further false designations of origin by Defendant with respect to words, names, and symbols associated with other manufacturers;

K.   Award PEP its costs suit and attorney fees, to the extent not awarded above; and

L.   Grant PEP such other and further relief as justice may require.

Respectfully submitted,

/s/ Alan Kan

Alan Kan
KAN CLARK LLP
Overlook I
2849 Paces Ferry Rd
Suite 640
Atlanta, GA 30339
P: 678-298-7911
F: 678-298-6291
E:akan@kanclarklaw.com

**ATTORNEY FOR PLAINTIFF**